**Jane and John DOE**

v.

**AMERICAN RED CROSS, American National Red Cross, Thomas Jefferson University Hospital, Joseph Grover, M.D., Scott Murphy, M.D. and Cardeza Foundation.**

Civ. A. No. 89–2673.

United States District Court,
E.D. Pennsylvania.

Dec. 29, 1989.

---

Thomas R. Kline, Beasley, Casey, Colleran, Erbstein, Thistle, Kline & Murphy, Philadelphia, Pa., for Jane and John Doe.

Howard M. Klein, Conrad & O'Brien, P.C., Philadelphia, Pa., for defendants.

James Lewis Griffith, Philadelphia, Pa., for Joseph Grover M.D.

Arthur M. Toensmeier, Post & Schell, P.C., Philadelphia, Pa., for Thomas Jefferson University Hosp.

## OPINION

LOUIS H. POLLAK, District Judge.

Jane Doe and her husband, John Doe, brought suit in the Philadelphia Court of Common Pleas against Thomas Jefferson Hospital, the Cardeza Foundation (an "entity established for the purpose of providing medical care and service and who through their physicians and/or staff rendered treatment and care to Jane Doe"), two physicians who treated Ms. Doe at Thomas Jefferson Hospital, and the Red Cross.[1] Jane and John Doe's complaint alleges that on November 14, 1984, at Thomas Jefferson Hospital, (1) Ms. Doe gave birth to a baby boy by caesarean section; (2) Ms. Doe received two blood transfusions, one before and one in the course of the delivery; (3) in 1987, Ms. Doe was diagnosed as having AIDS; (4) Ms. Doe "contracted AIDS solely and exclusively from the blood she received at Thomas Jefferson Hospital prior to and during her surgery;" (5) the Red Cross was the supplier of the contaminated blood; and (6) Jane and John Doe are, on a variety of legal theories, entitled to damages for injuries each has suffered because of the negligent acts and omissions of the several defendants.

Contending that the lawsuit is one falling within the original jurisdiction of federal district courts, the Red Cross, a federally-chartered corporation domiciled in Washington, D.C., has (with the consent of all the other defendants) removed the suit to this court. Urging that federal courts are without jurisdiction of a case of this kind, the plaintiffs have moved, pursuant to 28 U.S.C. § 1447(c), that the case be remanded to Common Pleas.

## I.

Red Cross' contention that this is a removable lawsuit is not based on diversity of citizenship: although there is diversity as between the Washington-based Red Cross and the Does, who are Pennsylvanians, the defendants other than the Red Cross are also Pennsylvanians. *See Strawbridge v. Curtiss*, 3 Cranch 267, 2 L.Ed. 435 (1806). Nor is the Red Cross contending that any of the plaintiffs' substantive claims is a cause of action embodying some element of federal law: to the contrary, the torts alleged are unalloyedly Pennsylvania torts. What the Red Cross is relying on is a phrase in the Red Cross Act, the 1905 statute, amended in 1947, which chartered the Red Cross and delineated its powers. The crucial phrase appears in the opening clause of 36 U.S.C. § 2:

> The name of this corporation shall be "The American National Red Cross," and by that name it shall have perpetual succession, with the power to sue and be sued in courts of law and equity, State or Federal, within the jurisdiction of the United States;

---

1. The complaint separately names "The American Red Cross" and "The American National Red Cross." Since nothing seems to turn on this distinction, the uniform nomenclature in this opinion is the "Red Cross."

The Red Cross reads the concluding phrase—"with the power to sue and be sued in courts of law and equity, State or Federal, within the jurisdiction of the United States"—as a grant of jurisdiction to federal district courts (and, evidently, of concurrent jurisdiction to state courts of first instance) to entertain all law suits to which the Red Cross is a party, without regard to the nature of the claim or the amount in controversy. Plaintiffs read the phrase as conferring on the Red Cross the capacity to sue and be sued in all American courts, but not as a grant of jurisdiction to any court.

This very issue—the removability to a federal district court of a suit against the Red Cross arising out of a transfusion of allegedly AIDS-infected blood—has been addressed in fifteen other cases. Eight motions to remand have been granted; seven have been denied.[2]

## II.

If Congress so intends, it apparently has power to vest in federal district courts, and other courts established pursuant to Article III of the Constitution, jurisdiction over any case to which the Red Cross, or any other federally chartered corporation, is a party, without regard to the nature of the case. Such a case would be deemed cognizable by a federal court as one "arising under this Constitution, [and] the laws of the United States," within the meaning of Article III. The line of authority for sup-

posing that such a grant of jurisdiction would pass constitutional muster traces back to Chief Justice Marshall's opinion for the Supreme Court in *Osborn v. United States*.[3]

In *Osborn*, Marshall, in 1824, sustained the authority of an Ohio federal circuit court to entertain a suit brought by the Second Bank of the United States to enjoin the Auditor of Ohio from levying on Bank assets to collect a tax imposed in alleged contravention of the Bank immunity from state taxation that Marshall had announced five years earlier in *McCulloch v. Maryland*.[4] When *Osborn* was decided, the district and circuit courts were not vested with any general federal-question jurisdiction;[5] in the absence of a particular statutory provision linking federal jurisdiction to a particular litigant or category of issues, federal questions usually did not get into federal courts except on writs of error to the Supreme Court from the highest courts of the states,[6] as in *McCulloch*. Marshall, in *Osborn*, keyed the circuit court's federal-question jurisdiction to a provision in the Bank's charter giving the Bank authority "to sue and be sued, plead and be impleaded, answer and be answered, defend and be defended, in all state courts having competent jurisdiction, and in any circuit court of the United States." Because this language—unlike the "sue and be sued" language in the charter of the First Bank of the United States, construed by Marshall in *Bank of the United States v. De-*

2. The most recent case was *Collins v. American Red Cross*, 724 F.Supp. 353 (E.D.Pa.1989), decided by my colleague Judge Waldman. The fourteen prior cases are listed in footnotes 1 and 2 of Judge Waldman's opinion.

3. 9 Wheat. 738, 6 L.Ed. 204 (1824).

4. 4 Wheat. 316, 4 L.Ed. 579 (1819).

5. The Act of February 13, 1801, 2 Stat. 89, enacted in the closing days of John Adams' Administration, had contained such a federal-question jurisdictional provision; but, a year later, after Adams was succeeded by Jefferson, and Congress had changed hands, the 1801 Act was replaced by the Act of April 29, 1802, 2 Stat. 128, 156, amended in 1803, 2 Stat. 199, 244, which essentially reinstated the jurisdictional scheme contemplated by the Judiciary Act of 1789, 1

Stat. 23, 73, limiting civil litigation in the district and circuit courts to diversity, alien-party, consul-defendant and admiralty cases. *See* Bator, Mishkin, Meltzer and Shapiro, Hart and Wechsler's The Federal Courts and The Federal System (3d ed. 1988) 32–5.

6. From time to time, to be sure, the circuit courts and the Supreme Court had to address federal questions that arose interstitially in diversity cases. *See, e.g., Fletcher v. Peck,* 6 Cranch 87, 3 L.Ed. 162 (1810). And, of course, the Supreme Court's modest original docket presented some not inconsequential federal questions. *See, e.g., Chisholm v. Georgia,* 2 Dall. 419, 1 L.Ed. 440 (1793); *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803).

*veaux*[7]—expressly referred to the federal courts ("every circuit court of the United States"), Marshall concluded that Congress had intended the charter provision to be jurisdictional: "... it would be difficult," he said, "to substitute other terms which would be more direct and appropriate for the purpose."[8] Having drawn the inference—an arguable inference, to be sure, but hardly an overwhelming one—that the charter language was meant to confer jurisdiction, Marshall undertook to demonstrate that any case involving the Bank was a federal-question case: "Take the case of a contract, which is put as the strongest case against the bank. When a bank sues, the first question which presents itself, and which lies at the foundation of the case, is, has this legal entity a right to sue? Has it a right to come, not into this court particularly, but into any court? This depends on a law of the United States. The next question is, has this being a right to make this particular contract? ... The case arises emphatically under the law; the act of congress is its foundation. The contract could never have been made, but under the authority of that act.... That other questions may also arise, as the execution of the contract, or its performance, cannot change the case, or give it any other origin than the charter of incorporation."[9]

Marshall's construction of Article III was spacious—far broader than the case before him—but it surely was so intended, and hence it has never been thought to be dismissible as dictum.[10] To the contrary, the Court in the fullness of time built upon *Osborn,* extending it beyond Marshall's own horizon, with the result that, early in this century, Congress felt called on to curtail an extension of federal jurisdiction for which there seemed no warrant in sound judicial administration. The story is well told in a perceptive article written over half a century ago:

The opinion was an achievement characteristic of Marshall. If the Act did permit the Bank to sue in the courts of the United States, the specific case before the Court was clearly one arising under the Constitution because the plaintiff invoked a constitutional right which was alleged to have been violated by the defendant. No more had to be decided to dispose of the actual case. But Marshall was apparently anxious to establish the validity of a grant of federal jurisdiction in any suits by or against the Bank on ordinary commercial transactions. This concern is easily understandable. The Government was interested as an owner in the Bank and the Bank was performing governmental service. Moreover, the Bank was the object of great popular hatred and of measures of reprisal by many state legislatures. It was sadly in need of a federal haven for its litigation. The doctrinal channel leading to that haven was quite obvious, once discovered. Whatever the claim it made, a suit by the Bank raised a federal question; for in any suit, the capacity of the Bank to sue, its capacity to contract or to own property, was an issue to be decided or assumed in the Bank's favor. These ever-present federal questions were sufficient to sustain constitutionality, once it was decided that Congress did grant jurisdiction of that scope. They were sufficient to tinge any case by the Bank with federal courts to entertain the Bank's mine-run litigation.

---

**7.** 5 Cranch 61, 3 L.Ed. 38 (1809). The First Bank's charter gave the Bank power "to sue and be sued, plead and be impleaded, answer and be answered, defend and be defended, in courts of record, or any other place whatsoever." *Id.* at 85.

**8.** 9 Wheat. at 817.

**9.** *Id.* at 823–25. Dissenting alone, Justice Johnson disagreed with his Chief both on whether the charter provision was intended by Congress to be a grant of jurisdiction and on whether Congress could, under Article III, authorize fed-

**10.** An even more celebrated example of a construction of the judicial power that outran the case before the Court, that appears to have been intended to do so, and that must therefore be treated as a deliberate constitutional holding, is Justice Brandeis' opinion for the Court in *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), discussed by Judge Friendly in *In Praise of Erie—And the New Federal Common Law,* 39 N.Y.U.L.Rev. 383, 385–6 (1964).

al color so as to enable a federal court to deal with all its "questions of fact or law."

In the *Pacific Railroad Removal Cases* [115 U.S. 1, 5 S.Ct. 1113, 29 L.Ed. 319], decided in 1885, the Court applied the doctrine to what may seem to be a similar situation abstractly, but certainly not practically. The suits were ordinary actions for personal injuries against a railroad incorporated under a federal act. The railroad was permitted to invoke federal jurisdiction, by removal, because, as in the *Osborn* case, the federal act giving the railroad legal life and capacities was at the foundation of any suit by or against it. The railroad was owned privately. It was performing no governmental functions. There was no comparable need of a federal forum. The issue was not whether under the Constitution Congress was authorized to grant federal jurisdiction to a federal corporation by a special act which was taken to have granted it. The issue was, rather, whether in a general grant of federal jurisdiction, by the Act of 1875, in cases arising under the laws of the United States, Congress included the special case of litigation by federal corporations actually involving no disputed federal claim. The decision in these Cases in favor of federal jurisdiction—a triumph of mechanical logic, rather than statesmanship as in the *Osborn* case—diverted a large stream of non-federal litigation to the federal courts and excited strong local opposition.[11]

As Professor Paul Mishkin has put the matter, the *Pacific Railroad Removal Cases* "held that federal incorporation of a party *ipso facto* made a case one 'arising under' national law within the 1875 Act."[12] To protect federal court dockets from federal incorporation cases that were of no substantive federal consequence, Congress in 1925 enacted the predecessor[13] of what is now Section 1349 of Title 28:

> The district courts shall not have jurisdiction of any civil action by or against any corporation upon the ground that it was incorporated by or under an Act of Congress, unless the United States is the owner of more than one-half of its capital stock.

The Red Cross, a philanthropic enterprise, is not organized as a stock company. Moreover, notwithstanding that eight of the fifty members of its Board of Governors are appointed by the President of the United States,[14] and "although the Red Cross serves a vital national interest and cooperates closely with the United States Government, it nonetheless functions independently and is in no way controlled by the Government." *C.H. v. American Red Cross*, 684 F.Supp. 1018, 1022 (E.D.Mo. 1987);[15] accord, *Griffith v. Columbus Area Chapter of the American Red Cross*, 678 F.Supp. 182, 185–6 (S.D.Ohio 1988).

The dispositive question, then, is whether, notwithstanding that the Red cross is not a government instrumentality and is not under government control, the "sue and be sued" clause in the Red Cross charter is to be read as reflecting a decision by Congress to open the doors of the federal courts to the non-federal and non-diversity litigation of this particular federally chartered corporation. That is the question next to be addressed.

### III.

In arguing that the question calls for an affirmative answer, the Red Cross places strong reliance on the fact that the original charter language—"sue and be sued in

---

11. Shulman and Jaegerman, *Some Jurisdictional Limitations on Federal Jurisdiction*, 45 Yale L.J. 393, 404–6 (1936) (footnotes omitted).

12. Mishkin, *The Federal "Question" in the District Courts*, 53 Colum.L.Rev. 157, 160 n. 24 (1953).

13. 43 Stat. 936, 941.

14. 36 U.S.C. § 5.

15. On the question whether the "sue and be sued" clause in the Red Cross charter was meant to create federal-question jurisdiction, the court in *C.H. v. American Red Cross* reached a conclusion different from that arrived at in Part III, *infra*, of this opinion; but the court nevertheless entered an order of remand, on grounds not pertinent in the case at bar.

courts of law and equity within the jurisdiction of the United States"—was amended in 1947 by the insertion of the phrase "State or Federal" after "courts of law and equity." It is urged that the change closely parallels the change in charter language from the First Bank ("to sue and be sued ... in courts of record") to the Second Bank ("to sue and be sued ... in all state courts having competent jurisdiction, and in any circuit court of the United States") that led Marshall, in *Osborn*, to find that Congress had intended to confer on the new Bank an automatic access to the federal courts which, Marshall had found in *Deveaux*, was not vouchsafed to the old Bank. To buttress its reading of the 1947 amendment, the Red Cross points to Recommendation No. 22 of the 1946 report on the organization of the Red Cross prepared by the so-called "Harriman Committee."[16]

> *The Charter should make it clear that the Red Cross can sue and be sued in the Federal Courts.* The present Charter gives the Red Cross the power "to sue and be sued in courts of law and equity within the jurisdiction of the United States." The Red Cross has in several instances sued in the Federal Courts, and its powers in this respect have not been questioned. However, in view of the limited nature of the jurisdiction of the Federal Courts it seems desirable that this right be clearly stated in the Charter.

The argument has a certain plausibility. But it ultimately fails to persuade, for the reasons articulated by Judge Waldman in his careful opinion in *Collins v. American Red Cross*, 724 F.Supp. 353, 357 (E.D.Pa. 1989) (footnote omitted):

> Even assuming that Congress adopted the language of this Report and not merely its recommendations, which does not appear to be the case, the court finds that the language in the three sentences

accompanying Recommendation No. 22 is ambiguous at best. There is a reference to the "limited nature of the jurisdiction of the Federal Courts." The Report states, however, that "the Red Cross has in several instances sued in the Federal Courts, and its powers in this respect have not been questioned" but concludes that a more clear statement to this effect would be desirable.

It appears to be at least as likely as not that the Committee only was seeking to confirm powers it believed the Red Cross had already been granted and utilized pursuant to language in the original charter of the type held since *Deveaux* merely to create a general capacity to litigate. The available legislative history suggests nothing to the contrary. Rather, it suggests that at least several Senators viewed the amendment as conferring powers upon the corporation, not as conferring new jurisdiction upon the courts, and one Senator viewed its purpose as making clear that although it was a federal corporation the Red Cross could be sued in a state court. See Hearing on S. 591 Before the Senate Committee on Foreign Relations, 80th Congress, J 1st Sess. 7–11 (1947).[17]

Until the current spate of Red Cross blood-transfusion litigation, it appears to have been generally accepted that the 1947 amendment of the Red Cross' "sue and be sued" charter provision was simply confirmatory of prior federal court rulings sustaining the Red Cross' capacity to litigate in federal courts. Thus, in his authoritative article on *The Legal Status of the Red Cross*, published in 1957, the late Wesley A. Sturges noted that, as determined by a federal district court in Florida in 1951, in *Patterson v. American National Red Cross*,[18] the Red Cross' charter-defined domicile in the District of Columbia, taken

---

**16.** The formal title of the Harriman Committee's report was *The American Red Cross Report of The Advisory Committee on Organization.*

**17.** As Judge Waldman further observes, 724 F.Supp. at 357, Congress' 1947 amendment of the Red Cross charter stands in sharp contrast to its 1947 amendment of the "sue and be sued"

clause in the charter of the Federal Crop Insurance Corporation; the amended charter language of the F.C.I.C. expressly provided for federal district court "jurisdiction ... without regard to the amount in controversy."

**18.** 101 F.Supp. 655 (S.D.Fla.1951).

together with the "sue and be sued" clause, established the basis for removal on diversity grounds of a suit commenced by Florida plaintiffs against the Red Cross in a Florida state court.[19] Had it been apparent that the 1947 amendment had established that law suits involving the Red Cross were, *ipso facto*, federal-question cases, Dean Sturges would presumably have pointed out that the *Patterson* holding was a superfluity.

## IV.

In *Roche v. American Red Cross*,[20] one of the earliest of the current group of Red Cross blood-transfusion cases, Judge Keeton entered an order of remand. His characteristically thoughtful opinion rejected the Red Cross' construction of the "sue and be sued clause" for reasons similar to those set forth by Judge Waldman in *Collins*, and discussed in Part III, *supra*, of this opinion. In the course of his *Roche* opinion Judge Keeton noted that, pursuant to 28 U.S.C. § 1447(d), "[a] district court's decision to remand a case to state court is not reviewable on appeal or otherwise,"[21] and, "[t]herefore, courts should be cautious about remand."[22] "Nevertheless," Judge Keeton went on to say, "the trend of decisions is that removal statutes will be strictly construed and that doubts should be resolved against removal.... There are two reasons for this trend. First, a plaintiff's choice of forum should not be denied lightly. Second, major inefficiencies result where a district court's decision that removal was proper is ultimately overturned on appeal after a full trial on the merits."[23]

The question whether the Red Cross' charter turns all Red Cross cases into federal-question cases is a close one, as is attested by the close division among the courts that have considered the problem since the blood-transfusion cases commenced in 1987. In this court's view, the history of the 1947 amendment of the "sue and be sued" provision in the Red Cross' charter does not establish that Congress singled out the Red Cross for preferential treatment by according that particular charitable enterprise, estimable though it be, an access to federal courts, for the disposition of cases governed by state law, which is not enjoyed by the generality of private federal corporations. The thrust of Congressional policy since 1925 has been to limit federal-question jurisdiction of cases not involving government instrumentalities to those situations in which the governing law is federal. The policy is a sound one. It respects the balance of authority between state and federal courts which is an essential ingredient of the federal system. Accordingly, in an accompanying order, this case, arising under the law of Pennsylvania, will be remanded to the Court of Common Pleas.

## ORDER

For the reasons stated in the accompanying opinion, plaintiffs' motion to remand this case to the Court of Common Pleas is GRANTED.

---

**19.** Sturges, *The Legal Status of the Red Cross*, 56 Mich.L.Rev. 1, 25. Dean Sturges was also at pains to point out that the fact that the Red Cross was a federal corporation was not a ground of federal jurisdiction. *Id.* at 26 at the last paragraph of n. 67.

**20.** 680 F.Supp. 449 (D.Mass.1988).

**21.** But, notwithstanding the apparent absoluteness of 28 U.S.C. § 1447(d), a remand order not predicated on 28 U.S.C. § 1447(c) is reviewable via an application for mandamus. *Thermtron*

*Products, Inc. v. Hermansdorfer*, 423 U.S. 336, 96 S.Ct. 584, 46 L.Ed.2d 542 (1976); *Air–Shields, Inc. v. Fullam*, 891 F.2d 63 (3d Cir.1989). In the instant case, as in the other Red Cross blood-transfusion cases, the remand question does turn on an aspect of Section 1447(c), namely, whether "the district court lacks subject-matter jurisdiction."

**22.** 680 F.Supp. at 451.

**23.** 680 F.Supp. at 451.