884 So.2d 257 (2004)
Valerie PAGAN and Jami Pagan, Appellants,
v.
SARASOTA COUNTY PUBLIC HOSPITAL BOARD, d/b/a Sarasota Memorial Health Care System; SMH Physician Services, Inc., a Florida not-for-profit corporation, d/b/a First Physicians Group of Sarasota; Kristen L. Paulus, M.D.; Michael M. Shroder, M.D.; Audrey Aloise Roehrig; and Florida Physicians Insurance Corporation, Inc., Appellees.
No. 2D02-5672.
District Court of Appeal of Florida, Second District.
August 13, 2004.
Mark Dungan of Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., Sarasota, for Appellants.
*258 David A. Wallace of Williams, Parker, Harrison, Dietz & Getzen, for Appellees Sarasota County Public Hospital Board, SMH Physician Services, Inc., Kristen L. Paulus, M.D., and Michael M. Shroder, M.D.
Stephen E. Day and Rhonda B. Boggess of Taylor, Day & Currie, Jacksonville, for Appellee First Professionals Insurance Company, Inc., f/k/a Florida Physicians Insurance Co.
No appearance for Appellee Audrey Aloise Roehrig.
Joel S. Perwin of Podhurst Orseck, P.A., Miami, for Amicus Curiae Florida Trial Lawyers.
ALTENBERND, Chief Judge.
Valerie and Jami Pagan appeal a summary final judgment that was entered in an unusual action for declaratory relief filed by Sarasota County Public Hospital Board (Hospital Board) and SMH Physician Services, Inc., d/b/a First Physicians Group of Sarasota (First Physicians Group). The Hospital Board and First Physicians Group sought a legal ruling that First Physicians Group and the doctors who practiced medicine through this nonprofit corporation were entitled to all the benefits of sovereign immunity. See § 768.28, Fla. Stat. (2001). The trial court's judgment so rules as to the Pagans' claim. We conclude that the Pagans have not demonstrated a basis that entitles them to receive a reversal of this judgment.
On the other hand, it is equally clear that the complex issues presented by this action for declaratory relief were not fully litigated and that the trial court did not intend the ruling to affect other persons who may be similarly situated to the Pagans. Accordingly, we decline to adopt the position argued by the Hospital Board and First Physicians Group that this ruling has broad application. Although the trial court's order contains language broader than necessary to decide the dispute between the Pagans and First Physicians Group, we limit the ruling to those parties. Whether this nonprofit corporation and all of the forty to fifty doctors who practice in this group are entitled to governmental immunity in all cases is not an issue that can be resolved on this record.

I. THE CREATION OF FIRST PHYSICIANS GROUP
The Hospital Board, which is comprised of nine publicly elected members, is the governing board of the Sarasota County Public Hospital District. The Hospital Board was created by a special act of the legislature in 1949[1] at a time when private, for-profit corporations played little role in the construction of hospitals. It is undisputed that such hospital boards and their employees can possess the protections provided by sovereign or governmental immunity, subject to the limited waiver of sovereign immunity contained in section 768.28. See, e.g., Eldred v. N. Broward Hosp. Dist., 498 So.2d 911 (Fla.1986); Brown v. N. Broward Hosp. Dist., 521 So.2d 143 (Fla. 4th DCA 1988); Lower Fla. Keys Hosp. Dist. v. Littlejohn, 520 So.2d 56, 57 (Fla. 3d DCA 1988); see also Hillsborough County Hosp. Bd. v. Taylor, 546 So.2d 1055 (Fla.1989).
The Hospital Board's enabling legislation provides that the Hospital Board is "authorized and empowered":
(q) To the extent permitted by the Constitution and laws of this state, to establish, operate, or support subsidiaries and affiliates, either for profit or not for profit, to assist the hospital board in *259 fulfilling its declared public purpose of provision for the health care needs of the people of the hospital district.... The establishment, operation, or support of a subsidiary or affiliate corporation... is hereby declared to be a public purpose and necessary for the preservation of the public health and for a public use and for the welfare of the hospital board and inhabitants of the hospital district.
Ch. 26468, Laws of Fla. (1949), as amended by ch. 86-373, § 1, Laws of Fla.
Based upon this provision, in 1994 the Hospital Board voted at a public meeting to create SMH Physician Services, Inc., as a nonprofit corporation. The Hospital Board's creation of this nonprofit corporation was apparently justified on the theory that Sarasota County did not have an adequate supply of primary care physicians, that market forces within the private sector could not supply these physicians, and that governmental action was necessary to assure an adequate supply of primary care physicians for the people of Sarasota County.[2] Once incorporated, the corporation began providing medical services under the fictitious name of First Physicians Group.
First Physicians Group grew rapidly. By the time this lawsuit was filed in 2001, the group included more than forty physicians practicing in a wide range of specialties. It does not have a single location, but has doctors in about fifteen separate locations.[3] The group has apparently attracted a few doctors into the community, but our record suggests that most of the members of this group were doctors practicing in Sarasota County in 1994 who have simply merged their medical practices into this nonprofit corporation.
Although First Physicians Group is a nonprofit corporation, this is not a group of doctors that is serving primarily or only the poor. These doctors appear to accept patients and receive payments from their patients and insurance companies just like any private clinic or professional association of physicians. The Hospital Board does not appear to control these doctors' fees or the selection of their patients. The doctors in this group are only required to perform eighteen hours of community service each year. The corporation is a nonprofit corporation, but the physicians within the group earn large salaries established by complex production formulas similar to those used in private sector medical groups. In 2000, many of the physicians had incomes in excess of $200,000 and several had incomes in excess of $400,000.
The Hospital Board created this non-profit corporation, and it has the power to dissolve it. It used government money to create this corporation. The Hospital Board elects the nine members of the corporation's board, and a majority of those elected must be sitting Hospital Board members. The corporation actually runs at a loss and receives additional government funds annually to cover its expenses.[4] *260 The doctors in this group are not required to admit their patients to Sarasota Memorial Hospital. Their patients may be admitted to other hospitals in the community. If the Hospital Board decided to dissolve the corporation, the corporation's remaining assets would revert to the Hospital Board.

II. THE SIGNIFICANCE OF GOVERNMENTAL IMMUNITY FOR FIRST PHYSICIANS GROUP, ITS DOCTORS, AND PATIENTS IN SARASOTA COUNTY
Since the creation of this nonprofit corporation, First Physicians Group has taken the position that it is a governmental entity and that the doctors within the group are government employees. Patients have disagreed. The outcome of this dispute has significant ramifications for medical malpractice lawsuits, for First Physicians Group, for the doctors it employs, and for their patients.
If these doctors do not have the benefit of governmental immunity, then their patients can pursue malpractice claims just like other patients bring claims against other doctors. The duty that a typical doctor owes to a patient is governed by the professional negligence standard, which generally requires that the doctor provide that level of care that a similar and reasonably careful physician would provide. See § 766.102(1), Fla. Stat. (2003); Fla. Std. Jury Instr. 4.2(a). On the other hand, if the doctors at First Physicians Group receive the benefit of governmental immunity, they can only be personally sued if they act "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." See § 768.28(9)(a), Fla. Stat. (2003).
For First Physicians Group the difference is equally significant. If it does not possess governmental immunity, it will be vicariously liable to its patients for the actions of its doctors just like any other private medical professional corporation. Its liability will not have any special limits or caps that are different from the rules that apply to for-profit medical professional corporations. If it is an instrumentality of a governmental agency, then it cannot be liable for a patient's claim in excess of $100,000 unless the legislature orders it to pay the claim. See § 768.28(5), Fla. Stat. (2003). Likewise, claims against it will be controlled by the governmental presuit procedures, and attorneys representing patients against First Physicians Group will be limited to a twenty-five percent contingency fee. See § 768.28(6), (8), Fla. Stat. (2003).
It is understandable that First Physicians Group, the medical community, and patients within Sarasota County would wish to obtain a final legal decision establishing whether this method of creating a nonprofit corporation controlled by a government board is effective in allowing doctors to obtain immunity from malpractice suits without sacrificing the income of private practice. If this method works, then economically it may be logical for many local physicians to join the nonprofit group. It might also be logical for many local patients to seek health care in nearby counties where doctors remain personally and professionally responsible to the patients and liable for negligence based upon the usual, reasonable levels of patient care.

III. THE UNUSUAL ACTION FOR DECLARATORY RELIEF
Sovereign or governmental immunity is usually raised on a case-by-case basis as an affirmative defense by both the governmental *261 agency and its employees. In this case, however, the Hospital Board and First Physicians Group decided to file a separate action for declaratory relief seeking a definitive ruling that they were entitled to sovereign immunity as a matter of law.
The complaint for declaratory relief was filed in June 2001 by the Hospital Board, First Physicians Group, and three of its physicians: Carlos F. Caballero, M.D., Kristen L. Paulus, M.D., and Michael M. Shroder, M.D. These plaintiffs sued Florida Physicians Insurance Corporation, Inc., which is the professional liability insurance company for First Physicians Group and its doctors. They also sued Valerie and Jami Pagan, Mary Colonese, and Audrey Aloise Roehrig.
It is clear that Florida Physicians Insurance Corporation was not truly an adverse party in this action. It has an exclusion in its insurance policy that limits its coverage in the event that the insured has governmental immunity. Thus, First Physicians Group was in the odd, if not unique, position of suing its insurance company to prove that the insurance company was not obligated to provide it with certain coverage. Florida Physicians Insurance Company apparently concluded that it would benefit if First Physicians Group and its doctors had limited liability. Thus, it never took an adversarial role in the trial court and has aligned itself with its insureds in this appeal.
The complaint for declaratory judgment described the remaining defendants as persons who had already filed medical malpractice suits against First Physicians Group and one or more of its doctors. The complaint admitted that First Physicians Group and the relevant doctors had already raised governmental immunity as a defense in the pending lawsuits but claimed a need to resolve the legal issue as to these parties in a separate proceeding.
In describing each of the defendants who were medical malpractice plaintiffs in separate pending lawsuits, the complaint alleged simply that Audrey Aloise Roehrig sued Dr. Caballero for "failing to use the appropriate standard of care in his treatment of" her. As to Mary Colonese, the complaint with equal brevity claimed that she has sued Dr. Paulus. Finally, as to the Pagans, the complaint alleged that they sued Dr. Shroder for a failure to use the appropriate standard of care in his treatment of Valerie Pagan. No further detail about these malpractice claims was ever alleged or developed below. Because of the limited record in this case, we have no information whatsoever about the treatment of Mrs. Pagan by Dr. Shroder.
Two months after the complaint for declaratory relief was filed, Dr. Caballero voluntarily withdrew as a plaintiff. Thus, he ceased to be a party to the proceedings. The party who had sued him, Ms. Roehrig, initially moved to dismiss the action for declaratory relief. Later, in December 2001, Altom M. Maglio, Esquire, filed an answer on her behalf. Since that time, she has not participated in the lawsuit and the parties seem to have stopped serving her attorney. The order granting summary judgment, the final judgment, and the notice of appeal were not served on Ms. Roehrig or her lawyer. Thus, we can only assume from this record that she is either still an active party in the trial court and that no judgment has been entered against her, or that she was somehow dismissed from the action by documents that are not in our record.
At approximately the same time that Dr. Caballero withdrew from the lawsuit, the plaintiffs filed a notice of voluntary dismissal as to Mary Colonese. However, Dr. Paulus, who allegedly was her treating *262 physician, did not withdraw from the lawsuit. Following the dismissal of Mary Colonese, it is not obvious that Dr. Paulus has any legal need to resolve the question of immunity in this action.
As a result of these shifts in the action for declaratory relief, it soon became a lawsuit in which the Pagans' claim was the only case truly in controversy and the lawsuit was structured only to obtain a resolution of the affirmative defense that First Physicians Group had earlier filed in the Pagans' malpractice lawsuit. Although the Pagans moved to dismiss the complaint for declaratory relief on the ground that it was an improper lawsuit to resolve this affirmative defense, that motion was denied.[5]
Other parties who had pending claims against First Physicians Group apparently became aware of this lawsuit and were concerned that it could have a binding effect on their claims. Accordingly, separate attorneys representing Maria Torres, Judith Brandt, and Janie Sweet each filed motions to intervene and various documents and attachments supporting their motions.[6] In March 2002, these motions to intervene were denied in two orders that expressly declared that the intervenors have no legal interest in the outcome of this declaratory judgment action. The trial court ordered and adjudged that "nothing adjudicated in this action will be binding or have any effect by way of res judicata, [or] collateral estoppel" on the intervenors. See § 86.091, Fla. Stat. (2001) (providing in declaratory judgment action that "all persons may be made parties who have or claim any interest which would be affected by the declaration. No declaration shall prejudice the rights of persons not parties to the proceedings"). Thus, it is clear that the trial court decided to resolve only the issue of the affirmative defense raised by First Physicians Group in the Pagans' medical malpractice proceeding.

IV. THE SUMMARY JUDGMENT HEARING
The Hospital Board and First Physicians Group filed motions for summary judgment. The Pagans filed a competing motion for summary judgment. These motions were heard by the trial court in October 2002. The parties filed unusually limited materials prior to this summary judgment hearing. The record contains the affidavit of Della Shaw, who is the chief operating officer of First Physicians Group. It also contains a deposition of Ms. Shaw taken in the medical malpractice suit filed by Mary Colonese, and another deposition taken in the medical malpractice suit filed by Maria Torres, one of the unsuccessful intervenors. It contains the affidavit of G. Duncan Finlay, M.D., the chief executive officer of Sarasota Memorial Hospital and the Sarasota Memorial Health Care System. It also contains his deposition, which had been taken for purposes of this action and numerous other malpractice lawsuits. Finally, it contains a short affidavit from Brad Lerner, the chief medical administrative officer for First Physicians Group.
The record contains no pleadings or discovery material from the Pagans' lawsuit. Thus, we are in the odd situation of affirming a ruling on an affirmative defense when we know virtually nothing about the lawsuit. There are no depositions or affidavits *263 from any of the doctors involved in the treatment of Mrs. Pagan or any other patient. We know very little about how these doctors practice medicine or how their employment by a nonprofit corporation created by a governmental entity affects that practice.
Apparently, as a matter of litigation tactics, both sides decided that the controlling issue for purposes of summary judgment was whether the Hospital Board exercised sufficient control over First Physicians Group to be considered an instrumentality of the Hospital Board, and both sides believed that the materials in the record were sufficient to decide this issue in their favor. Thus, various other legal and public policy issues that have been argued on appeal were neither raised nor preserved in the trial court.
As to the specific issue argued at summary judgment, which revolved around whether the Hospital Board controlled First Physicians Group, the undisputed facts before the trial court showed that First Physicians Group was created by the Hospital Board, initially funded by the Hospital Board, and remains partially funded by it. The Hospital Board has the power to dissolve First Physicians Group and to claim any remaining assets upon dissolution. The nine members of First Physicians Group's board of directors are elected by the Hospital Board and serve at the pleasure of the Hospital Board. Under the bylaws and articles of incorporation of First Physicians Group, a majority of its board of directors must be composed of sitting Hospital Board members. The chief executive officer of the Sarasota Memorial Health Care System is required to also be president of First Physician Group. Approximately forty physicians have entered into employment agreements with First Physicians Group that provide for full-time employment with First Physicians Group and prohibit the maintenance of private practices or the treatment of any patients other than patients of First Physicians Group.
At the hearing, the Hospital Board and First Physicians Group successfully argued that "the structure dictates the control" and that the Hospital Board had structural control of First Physicians Group and therefore First Physicians Group and its employees were "agencies" of the Hospital Board entitled to sovereign immunity. See, e.g., Prison Rehabilitative Indus. & Diversified Enters., Inc. v. Betterson, 648 So.2d 778 (Fla. 1st DCA 1994); Shands Teaching Hosp. & Clinics, Inc. v. Lee, 478 So.2d 77 (Fla. 1st DCA 1985). The Pagans similarly focused on the Hospital Board's structural control of First Physicians Group as the decisive issue in determining whether First Physicians Group was a corporation primarily acting as an instrumentality or agency of the state, counties, or municipalities. See § 768.28(2). The Hospital Board argued that the doctors would have immunity if they were directly employed by the Hospital Board to work inside the hospital and that the creation of the nonprofit corporation did not alter this result.
At the conclusion of these arguments, the trial judge stated:
It seems to me that what the hospital is doing is spreading around their sovereign immunity because of what is perceived to be the malpractice crisis.
However, in following the law, I mean, I'm not here for public purposepublic policy purpose, you know, that's really not what I'm here for today, because I think it stinks. I think it's wrong. I think it's uncompetitive and I think the hospitalI think they ought to fix it by doing away with the independent corporation and just have these people as employees of the hospital. There would *264 be no question, you know, but anyway, I can't tell them how to do their business.
In following the law, it appears that they followed what they have to do to create this subsidiary or affiliate, whatever you want to call it, and I'm going to grant summary judgment.
I find that they're entitled to sovereign immunity, as much as I think it's bad public policy, and I hope that an appellate court would consider all of those arguments.
The trial court then entered a summary judgment order that stated: "Plaintiffs' Motion for Judgment is hereby granted. [First Physicians Group] and each of its employee physicians are entitled to sovereign immunity under Florida Statutes § 768.28." This language was repeated in the final judgment.
In light of the limited arguments made below and thus preserved for appellate review, and in light of the existence of case law that supports the trial court's conclusions based on those arguments, the Pagans have not demonstrated a basis for this court to reverse the final summary judgment in this case. See, e.g., Betterson, 648 So.2d 778. We therefore affirm the final summary judgment as to these parties.
We recognize that the language of the trial court's orders was substantially broader than was necessary to resolve the dispute between First Physicians Group and one or two of its doctors, on one side, and the Pagans, on the other side. The language could be misread to have binding effect on the intervenors or other nonparties. However, the trial court clearly did not intend this, and section 86.091 does not permit it. See also Fasig v. Fla. Soc'y of Pathologists, 769 So.2d 1151, 1154 (Fla. 5th DCA 2000). Dr. Caballero affirmatively opted out of this ruling, and the great majority of doctors at First Physicians Group have neither been involved in these proceedings nor asserted a claim of sovereign immunity to limit their own liability to claims of wanton and willful misconduct. The trial court's ruling is restricted to the claim between the Pagans and Dr. Michael M. Shroder and First Physicians Group as Dr. Shroder's employer.
It appears that the Hospital Board, First Physicians Group, and the two physicians who remain in this litigation are seeking an appellate court opinion holding, as a matter of law, that First Physicians Group and its employees are entitled to sovereign immunity in any medical malpractice action. It is a long-standing rule of appellate jurisprudence that the appellate court should not undertake to resolve issues which, though of interest to the bench and bar, are not dispositive of the particular case before the court. Marion County Hosp. Dist. v. Akins, 435 So.2d 272, 273 (Fla. 1st DCA 1983). Accordingly, while we affirm the trial court's ruling as it affects these parties on the basis of this limited record and based on the specific issues preserved for review by this court, the trial court was not authorized to make a broader legal holding, nor does this appellate court have a record or adequate arguments upon which it could announce any broader rule of law.
Affirmed.
SILBERMAN, J., Concurs.
CANADY, J., Concurs in result only.
CANADY, Judge, Concurring specially.
I agree with the majority's determination that the declaratory judgment in favor of the appellees should be affirmed. I write separately to explain the basis for my conclusion that the Hospital Board is entitled to sovereign immunity under section 768.28. Because I disagree with various *265 aspects of the majority's opinion, I have refrained from joining that opinion. In particular, I disagree with the majority's repeated characterization of the underlying declaratory judgment action as an "unusual action," as well as its statement that "the complex issues presented by this action for declaratory relief were not fully litigated." I also disagree with the majority's expressed unwillingness to announce a "rule of law" concerning the issue of statutory interpretation decided in this case.
In this concurring opinion, I will first comment briefly on my disagreement with the majority's opinion. Then, I will outline the issues presented by the parties. Finally, I will set forth the analysis which supports my conclusion that the trial court's decision should be affirmed.

I. THE MAJORITY OPINION
The majority acknowledges that the issue of whether the declaratory judgment action "was an improper lawsuit to resolve [the sovereign immunity] affirmative defense" raised in the underlying tort action by the Pagans is not at issue in this appeal. Nonetheless, the majority persists in calling into question the propriety of the declaratory judgment action. In my view, on the record before us, this is totally unwarranted.
Section 86.011, Florida Statutes (2002), provides, in pertinent part, that a "court may render declaratory judgments on the existence or nonexistence (1)[o]f any immunity, power, privilege or right." (Emphasis added.) The issue of whether a particular entity is entitled to sovereign immunity appears to fall squarely within the express provision of section 86.011. Where the status of an entity under section 768.28 has been challenged or is otherwise in doubt, it does not seem at all "unusual" for that entity to seek a declaratory judgment concerning its status. See Haines City v. Allen, 509 So.2d 982, 983 (Fla. 2d DCA 1987) (discussing "declaratory judgment action asking the circuit court to declare the city's rights with regard to sovereign immunity under section 768.28"); see also Strachan Shipping Co. v. Spigner, 573 So.2d 926, 927 (Fla. 1st DCA 1991) ("The determination of the existence of an immunity [under the workers' compensation law] is an appropriate subject for declaratory relief.").
Similarly unwarranted is the majority's statement that "the complex issues presented by this action for declaratory relief were not fully litigated." The dispositive issue of whether First Physicians Group was an instrumentality of the Hospital Board was extensively litigated. There is no suggestion in the record that either the appellants or the appellees were in any way foreclosed from fully developing any factual issues that they deemed material to the critical legal issues that they chose to present to the trial court. The majority states that "[w]e know very little about how these doctors practice medicine or how their employment by a nonprofit corporation created by a governmental entity affects that practice." The majority also stresses that "we know virtually nothing about the lawsuit" brought by the Pagans. Whatever bearing facts related to such matters might have on some hypothetical issues that the parties have not presented, they have no demonstrated connection with the issues actually before the trial court and this court. It is hard to see how the details of the Pagans' malpractice claim or facts concerning how the employee physicians "practice medicine" could have any relevance to the legal issue of whether the entity employing the treating physician was entitled to sovereign immunity under section 768.28. In short, I do not believe that the record before us is in any way deficient.
*266 Unlike the majority, I see no reason to shrink back from announcing as a rule of law that a corporate entity such as First Physicians Group, which was established by a sovereignly immune independent establishment of the state and which is subject to the type of control to which First Physicians Group is subject, is entitled to sovereign immunity. Such an announced rule is necessarily limited by the material facts of the case before us and the issues actually litigated. See Adelman Steel Corp. v. Winter, 610 So.2d 494, 502 (Fla. 1st DCA 1992) ("The holding or ratio decidendi of a decision is appropriately defined as the outcome of the case on the precise points discussed in the opinion stated in terms of the facts found to be material to the court's decision."); see also Arthur L. Goodhart, Determining the Ratio Decidendi of a Case, 40 Yale L.J. 161 (1930). The disposition of future cases presenting different material facts or raising different legal issues would, of course, not be bound by the rule announced in this case. But future cases presenting the same material facts and the same legal issues should be guided by the precedent established by this court's decision of the instant case. I am concerned that the majority opinion may be read to suggest that the decision of this case will not have such precedential effect. Denying precedential effect to the decision of this case in future cases presenting similar facts and issues would, however, be inconsistent with the fundamental principle that like cases should be treated alike. See Gessler v. Dep't of Bus. & Prof'l Regulation, 627 So.2d 501, 504 (Fla. 4th DCA 1993) ("The concept of stare decisis, by treating like cases alike and following decisions rendered previously involving similar circumstances, is a core principle of our system of justice.").

II. ISSUES ON APPEAL
The Pagans argue that the Hospital Board's control over First Physicians Group is insufficient for First Physicians Group to be considered an instrumentality of the Hospital Board. The Pagans contend that day-to-day operational control over a corporation is necessary to establish that the corporate entity is an instrumentality or agency under section 768.28(2). In making this argument, the Pagans rely on the case law articulating the requirement relating to control which is necessary to establish the existence of an employment or agency relationship. They also rely on the case law addressing the circumstances in which piercing of the corporate veil is justified. They contend that the sovereign immunity of the hospital district extends to First Physicians Group only if First Physicians Group can be considered the "alter ego" of the hospital district. Finally, the Pagans argue that the extension of sovereign immunity to First Physicians Groupwhich they characterize as essentially a private medical practiceis inconsistent with the public policy underlying the sovereign immunity statute. The Pagans contend that the Hospital Board improperly "has, in effect, attempted to sell its sovereign immunity to what is, for all practical purposes, a private medical practice." This public policy argument was not specifically raised by the Pagans in the proceedings before the trial court.
The Hospital Board argues that it is the right of control, not actual day-to-day operational control, that is sufficient to establish that an entity is acting as an instrumentality or agency. The Hospital Board emphasizes its role in creating First Physicians Group, its power to dissolve First Physicians Group and to appoint and remove all the members of the First Physicians Group board of directors, as well as the role of its officers and employees in the management of First Physicians Group. *267 The Hospital Board argues that the Pagans should not be allowed to raise the public policy argument for the first time on appeal but that the extension of sovereign immunity to First Physicians Group is in any event not inconsistent with the public policy underlying section 768.28.

III. ANALYSIS
The hospital district is an "independent establishment of the state" which is sovereignly immune from liability pursuant to the provisions of section 768.28. See Eldred, 498 So.2d 911, 913-14 (holding that the provisions of section 768.28 waiving sovereign immunity and limiting liability are applicable to hospital special taxing district as an independent establishment of the state under section 768.28(2)). The hospital district's immunity is not disputed by the Pagans.
It is also well established that a physician employed by a sovereignly immune entity is entitled to the benefit of sovereign immunity. See Pub. Health Trust v. Valcin, 507 So.2d 596, 601 (Fla.1987); White v. Hillsborough County Hosp. Auth., 448 So.2d 2, 2 (Fla. 2d DCA 1983); Bates v. Sahasranaman, 522 So.2d 545, 546 (Fla. 4th DCA 1988); Jaar v. Univ. of Miami, 474 So.2d 239, 244 (Fla. 3d DCA 1985). No facts have been adduced to show that the physicians who practice with First Physicians Group are anything other than employees of First Physicians Group. The liability of the appellee physicians thus depends on the status of First Physicians Group. If First Physicians Group is subject to the protection of section 768.28, its physician employees are generally immune from liability for negligent acts performed within the scope of their employment. See § 768.28(9).
The parties agree that the dispositive question presented by this case therefore is whether First Physicians Group is entitled to sovereign immunity by virtue of its relationship with the Hospital Board. The answer to this question turns on the meaning of the phrase "corporations primarily acting as instrumentalities or agencies of the state" in section 768.28(2), which defines the entities entitled to sovereign immunity. I conclude that the undisputed facts concerning the relationship between First Physicians Group and the Hospital Board, an independent establishment of the state, establish that First Physicians Group is a "corporation[ ] primarily acting as [an] instrumentalit[y] ... of the state."
In some circumstances, the analysis of whether a corporate entity is an instrumentality or agency focuses on the extent to which the corporate entity has been given the authority and responsibility to carry out a management function that would otherwise be directly carried out through governmental officials. See Skoblow v. Ameri-Manage, Inc., 483 So.2d 809, 811, 812 (Fla. 3d DCA 1986) (holding that corporation, under contract with state "to provide direct management for" state hospital and to coordinate long-range planning for the hospital, "was operating as an agency of the state"). Cf. Sebring Utils. Comm'n v. Sicher, 509 So.2d 968, 970 (Fla. 2d DCA 1987) (holding that utilities commission which was created in city charter as part of city government was entitled to sovereign immunity pursuant to section 768.28).
Generally, however, the analysis of whether a corporation is a governmental instrumentality or agency centers on the issue of control. In order for an entity to be considered an instrumentality or agency, it must be subject to something more than the sort of control that is exercised by the government in its regulatory capacity. See United States v. Orleans, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976) (holding that community action *268 agency, a nonprofit corporation established pursuant to the Economic Opportunity Act and subject to the federal standards and regulations, was not an instrumentality of the United States under Federal Tort Claims Act). The control that flows from a simple contractual arrangement between the government and a corporate entity ordinarily will not be considered sufficient to establish that the contracting corporate entity is an instrumentality or agency of the state. Cf. Mingo v. ARA Health Servs., Inc., 638 So.2d 85, 86 (Fla. 2d DCA 1994) (holding that contract defining corporate providers as independent contractors effectively "disavows [the corporation] as a corporation primarily acting as an instrumentality or agency of the state or its subdivisions"). And the mere fact that a corporation is created by the government will not necessarily establish that it is a governmental agency or instrumentality. See Doe v. Am. Red Cross, 727 F.Supp. 186 (E.D.Pa.1989) (holding that federally chartered corporation is not a government instrumentality).
The common understanding of the terms "agency" and "instrumentality" pointsat least in a general wayto the type of governmental control necessary for a corporation to be entitled to sovereign immunity under section 768.28(2). An instrumentality is defined as "something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out," or as "a part, organ, or subsidiary branch esp[ecially] of a governing body." Webster's Third International Dictionary 1172 (3d ed.1993). Agency has a similar meaning. It is defined as "a person or thing through which power is exerted or an end is achieved," or as "an establishment engaged in doing business for another." Id. at 40.
Further guidance is provided by the case law addressing the application of section 768.28. The two leading cases Shands Teaching Hospital & Clinics, Inc., 478 So.2d 77, and Betterson, 648 So.2d 778were both decided by the First District. In Shands the court concluded that the nonprofit corporation to which the State Board of Education leased the Shands Teaching Hospital was not entitled to the benefit of sovereign immunity. The corporate entity was determined to be "an autonomous and self-sufficient entity, one not primarily acting as an instrumentality on behalf of the state." Shands, 478 So.2d at 79. In making this determination, the court interpreted the statutory provision governing the establishment of the non-profit corporationsection 240.513, Florida Statutes (1985)as "reflect[ing] that Shands' day-to-day operations are not under direct state control." Id. The court referred to the case law under the Federal Tort Claims Act, which states that "the critical factor" in "... `determining whether an entity is a federal agency ... is the existence of federal government control over the "detailed physical performance" and "day to day operation" of that entity....' United States v. Orleans, 425 U.S. 807, 814, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976)'." Id. (quoting Lewis v. United States, 680 F.2d 1239, 1240 (9th Cir.1982)).[7]
In Betterson, the court reached a different conclusion regarding the status of the nonprofit corporation entitycommonly known as PRIDEwhich operated the prison industry program. Based on the *269 statutory provision requiring the Department of Corrections to "lease the prison industry program to a nonprofit corporation `organized solely for the purpose of operating' the program," the court determined that PRIDE had from its inception acted primarily as an instrumentality of the state. Id. at 780; see ch. 81-125, § 1, at 254, Laws of Fla.; § 946.502, Fla. Stat. (1988). While recognizing that under the statute "PRIDE was accorded substantial independence in the running of the work programs," the court focused on the fact that PRIDE's "essential operations nevertheless remained subject to a number of legislatively mandated constraints over its day-to-day operations." Id. at 780. Among the constraints mentioned by the court were requirements that: (a) PRIDE's sale to private entities be subject to approval by the governor; (b) PRIDE be subject to various regular state audits; (c) PRIDE's policies and procedures relating to the use of inmates in its work program be subject to approval by the Department of Corrections; and (d) the state have a reversionary interest in property acquired by PRIDE relating to correctional work programs. The court stated: "These statutory constraints cumulatively constitute sufficient governmental control over PRIDE's daily operations to require the conclusion as a matter of law that PRIDE has, from its inception, acted primarily as an instrumentality of the state." Id. at 780-81.[8]
In both Betterson and Shands, the issue of control played a prominent part in the analysis of whether the nonprofit corporate entity was acting primarily as an instrumentality of the state. Both cases make reference to the significance of governmental control over the "day-to-day operations" of the corporate entity whose status was at issue. See Betterson, 648 So.2d at 780 (referring to statute which "contained numerous provisions for extensive governmental control over PRIDE's day-to-day operation"); Shands, 478 So.2d at 79 (referring to statutory provisions reflecting that "Shands' day-to-day operations are not under direct state control"). There is, however, no bright line division between the "extensive governmental control" that was present in Betterson and the "direct [governmental] control" that was absent in Shands. The most that can be drawn from Betterson and Shands is that the "substantial independence" of any entity, coupled with significant governmental "constraints over [the entity's] day-to-day operations," Betterson, 648 So.2d at 780, will support a determination that the entity is an instrumentality, while "an autonomous and self-sufficient entity," whose "day-to-day operations are not under direct [governmental] control," Shands, 478 So.2d at 79, will not be considered an instrumentality.
In the case lawoutside the sovereign immunity contextaddressing the circumstances where a principalagent relationship exists, the issue of control is also crucial. The cases make clear, however, that when analyzing the issue of control, the focus should be on "the right to control, rather than actual control." Villazon v. Prudential Health Care Plan, Inc., 843 So.2d 842, 853 (Fla.2003) (citing Nazworth v. Swire, Inc., 486 So.2d 637, 638 (Fla. 1st DCA 1986) ("The standard for determining whether an agent is an independent contractor is the degree of control exercised by the employer or owner over the agent. More particularly, it is the right of control and not actual control, which determines *270 the relationship between the parties.") (citations omitted)). Thus, the existence of a principal-agent relationship turns on whether the principal has a sufficient right of control and not on the extent to which the principal exercises actual control.
Although particular entities "may be deemed agents of the state, [and] not agencies of the state" under section 768.28(2), Sierra v. Associated Marine Insts., Inc., 850 So.2d 582, 592 (Fla. 2d DCA 2003), review denied, 869 So.2d 538 (Fla.2004), these general principles governing the existence of principle-agent relationships nonetheless shed light on the question at issue here. Just as an ordinary agency relationship can exist without the exercise of actual day-to-day control by the principal, so can a corporation be acting primarily as an instrumentality or agency of a sovereignly immune entity without that entity exercising actual control over the day-to-day operations of the corporation.
The Pagans argue that First Physicians Group should not be considered an instrumentality or agency under section 768.28(2) unless the Hospital Board's control over First Physicians Group is such that the corporate veil could be pierced. This is nonsensical. It imputes to the legislature an intention to grant corporate entities immunity under section 768.28(2) only if those corporate entities are sham entities and if there is a showing of improper conduct in connection with the operation of the entities. See Dania Jai-Alai Palace, Inc. v. Sykes, 450 So.2d 1114, 1117, 1121 (Fla.1984) (holding that "allegations of mere instrumentality and improper conduct clearly state a cause of action" for piercing the corporate veil and reviewing extensive case law "hold[ing] that the corporate veil may not be pierced absent a showing of improper conduct"). A "mere instrumentality" or "alter ego" which is used as a "sham" and for some improper purpose is in an entirely different category from an entity acting primarily as a governmental instrumentality or agency. The type of control necessary to establish that a corporation is being used as a "sham" and "alter ego" or "mere instrumentality" is entirely different from the control necessary to establish that a corporate entity is entitled to immunity pursuant to section 768.28(2).
It would be unfaithful to the plain meaning of section 768.28(2) to impose a requirement for control of a type that is inconsistent with the separate corporate existence of the entity acting primarily as an instrumentality or agency. The authorization of immunity for corporations under section 768.28(2) necessarily involves a recognition that those corporations will carry out their operations in a manner that is separate and distinct from the operations of the governmental entity to which they are related. The control of the governmental entity over the corporation necessary to establish an instrumentality relationship under section 768.28(2) does not require that the corporation be subsumed in the governmental entity. The Pagans' argument to the contrary would effectively rewrite section 768.28(2).
First Physicians Group rightly points out that since the public policy argument raised by the Pagans was not presented to the trial court it is not properly argued on appeal. See Tillman v. State, 471 So.2d 32, 34 (Fla.1985) ("In order to be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved."); Dober v. Worrell, 401 So.2d 1322, 1324 (Fla.1981) (holding that it is "inappropriate for [an appellant] to raise an issue for the first *271 time on appeal from summary judgment"); Clock v. Clock, 649 So.2d 312, 315 (Fla. 3d DCA 1995) ("[A]n appellate court will not consider any ground for objection not presented to the trial court; review is limited to the specific grounds raised below."). Such an unpreserved issue cannot be the basis for reversal of the judgment entered by the trial court.
All the efforts of the Pagans to establish that First Physicians Group is not an instrumentality or agency of the Hospital Board run aground on the reality of the Hospital Board's undeniable right to control the operations of First Physicians Group. First Physicians Group began its existence as a creature of the Hospital Board, and it carries out its ongoing operations as a creature of the Hospital Board. The Hospital Board effectively directs the management of First Physicians Group through the appointment of all the members of the board of directors of First Physicians Group and by the placement of the chief executive officer of the Hospital Board's health care system in the position of president of First Physicians Group. The Hospital Board's authority to direct the management of the ongoing operations of First Physicians Group strongly supports the conclusion that First Physicians Group is an "intermediary ... through which [the] functions of a controlling force are carried out," Webster's, supra, at 1172, and thus properly considered an "instrumentality" as that term is commonly understood. See also Lebron v. Nat'l R.R. Passenger, 513 U.S. 374, 399-400, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995) (holding that "when the State has specifically created [a] corporation for the furtherance of governmental objectives[] and ... controls the operation of the corporation through its appointees .... [t]he corporation is part of the Government for purposes of the First Amendment"). There is no basis for concluding that First Physicians Group acts as "an autonomous and self-sufficient entity." Shands, 478 So.2d at 79. On the contrary, First Physicians Group is subject to significant governmental "constraints over [its] day-to-day operations." Betterson, 648 So.2d at 780.

IV. CONCLUSION
I therefore conclude that the trial court correctly decided as a matter of law that First Physicians Group is an instrumentality of the Hospital Board. First Physicians Group and the appellee physicians thus are entitled to sovereign immunity under section 768.28.
NOTES
[1] Ch. 26468, Laws of Fla. (1949).
[2] Our record does not contain any studies or data that may have been generated to support these conclusions.
[3] Our record contains information from a website that provides more detailed information about this group. See http://www.first-physiciansgroup.com.
[4] The deposition of G. Duncan Finlay, M.D., the president and CEO of Sarasota Memorial Health Care System, indicates that the Hospital Board infused more than $4,000,000 into this nonprofit corporation in fiscal year 2001. Dr. Finlay explained that when the physicians in this group were in private practice they generated income from laboratory work and x-rays. This work is now performed by other groups controlled by the Hospital Board. Apparently, the infusion of government money into this nonprofit corporation is designed to offset or compensate the doctors for this loss in personal revenue.
[5] The Pagans have not challenged the denial of their motion to dismiss in this appeal. Accordingly, we do not rule upon the correctness of that order.
[6] Indeed, approximately one-third of our entire record is consumed by the filings of the parties who wished to intervene.
[7] Although the fact is not mentioned by the Shands court, the statute provided for the "governance of the nonprofit corporation by a board of directors appointed by the President of the University of Florida and chaired by the Vice President for Health Affairs of the University of Florida." § 240.513(3)(b)(1).
[8] Although it was not mentioned by the Betterson court, the statute also required a showing that "[t]he members of the corporation were appointed by the Governor and confirmed by the Senate." § 946.504(5)(a)(1).